UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| LEONA WALKER, | * |
| --- | --- |
| Plaintiff, | * |
| v. | * Civil Action No. 1:16-cv-11965-ADB |
| NANCY A. BERRYHILL,[1] *Acting Commissioner of Social Security*, | * |
| Defendant. | * |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Leona Walker ("Ms. Walker" or "Claimant") brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. Currently pending are Claimant's motion to reverse the Commissioner's decision denying her disability benefits [ECF No. 16], and the Commissioner's cross-motion for an order affirming the decision. [ECF No. 22]. For the reasons described herein, the Court finds that the Administrative Law Judge's decision was not supported by substantial evidence and therefore <u>VACATES</u> the decision of the Commissioner and <u>REMANDS</u> the case for further administrative proceedings consistent with this opinion.

I.  BACKGROUND

   A.  **Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims**

---

[1] The original complaint was filed against Carolyn W. Colvin, but because Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, she was automatically substituted as the Defendant pursuant to Fed. R. Civ. P. 25(d).

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

B.  **Procedural Background**

Claimant filed her application for SSI and SSDI benefits on March 11, 2014. [R. 21].[2] She alleged that she became disabled on December 1, 2013, due to various psychiatric disorders including borderline personality, generalized anxiety, post-traumatic stress ("PTSD"), and major depressive disorders, as well as delayed sleep phase syndrome. [R. 24, 317, 325]. Her date last insured was December 31, 2015. [R. 39–40].

The Social Security Administration (the "SSA") denied Claimant's applications for SSI and SSDI benefits on June 20, 2014, and again upon reconsideration on August 8, 2014. [R. 21]. Thereafter, Claimant requested an administrative hearing, and a hearing took place before Administrative Law Judge ("ALJ") Paul Carter on September 8, 2015. [R. 21, 30]. Claimant, who was represented by counsel, appeared and testified at the hearing. [R. 21]. On October 19, 2015, the ALJ issued a decision finding that Claimant was not disabled. [R. 30]. The SSA Appeals Council denied Claimant's Request for Review on August 31, 2016 [R. 1]. On September 29, 2016, Claimant filed a timely complaint with this Court, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].

C.  **Factual Background**

Claimant was born on May 15, 1967. [R. 44]. She is unmarried and has no children. [R. 45]. Claimant currently resides in Boston, Massachusetts. [R. 43]. She holds a college degree in English from the University of Massachusetts Amherst. [R. 45–46]. She began to pursue a Master's degree, but never completed her studies. [R. 46].

---

[2] References to pages in the Administrative Record, which were filed electronically at ECF No. 11, are cited as "[R. __ ]."

Claimant has worked as a cashier or retail sales clerk on six different occasions from 2008 to 2013, never for more than six months at a time. [R. 227]. Claimant also worked as an intern for a housing program for one to two months in 2009, as a clerk for the Department of Revenue for three months in 2007, and as a substitute teacher for two periods of three to four months in 2007. [R. 46, 227].

**D.     Medical Evidence**

**1.     Record Evidence**

Claimant's medical records begin in 2011. At that time, she had been diagnosed with major depressive disorder and borderline personality disorder by two health care providers, Dr. Eugene Uzogara, MD, and Edwige Berrouet, Licensed Independent Clinical Social Worker ("LICSW"). [R. 325–26, 329–34, 337]. Each doctor assessed Claimant's Global Assessment of Functioning ("GAF"), and each assigned Claimant a GAF of 55, noting that previously, her highest GAF score within the past year was 50.[3] [R. 326, 331]. In April of 2011, Berrouet described Claimant as "irritable, angry, and tired," and noted that she was having problems with sleep, had "issues" with friends and family, and held a negative worldview. [R. 379]. Later in April of 2011, Berrouet continued to describe Claimant as irritable, angry, sleep deprived, and paranoid, with a "very negative worldview." [R. 435].

---

[3] The Global Assessment of Functioning is used to assign a numerical value to an individual's overall level of functioning. A GAF score considers impairments in psychological, social, and occupational functioning, but not impairments related to physical or environmental limitations. The GAF Scale ranges from 1 to 100. A score between 41 and 50 denotes "serious symptoms" or "any serious impairment in social, occupational, or school functioning." A score between 51 and 60 denotes "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." A score between 61 and 70 denotes "some mild symptoms" or "some difficulty in social, occupational, or school functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. text revision 2000).

In July of 2012, Claimant visited Dr. Nishi Bhopal, MD, a sleep medicine fellow at a sleep clinic, due to her difficulty sleeping, which she had experienced since age 13 or 14. [R. 315, 318]. Claimant reported that when she is awake for over 18–24 hours, her sleep deprivation results in hallucinations, anxiety, paranoia, jitters, and irritability. [R. 315–16]. Claimant also told Dr. Bhopal that she had been unemployed since she was fired from her job in October of 2011 due to customer complaints regarding her irritability. [R. 316]. Dr. Bhopal diagnosed Claimant with delayed sleep phase syndrome and bipolar disorder. [R. 317–18]. Claimant reported that her mood was "[h]orrible," but Dr. Bhopal noted that, while she was irritable, she was able to focus and act appropriately during their discussion. [R. 317].

In an initial behavioral health evaluation conducted by psychologist Shamaila Khan, PhD, in July of 2012, Claimant reported "losing friends, family members distancing and losing a job." [R. 440, 444]. Dr. Khan noted that Claimant "has frequent angry outbursts and is impulsive . . . often isolates herself to avoid negative interactions, is irritable, has difficulty falling asleep and often lacks an appetite." [R. 444].

In April of 2013, Claimant reported to primary care physician Dr. Joseph Wright, MD that she had difficulty sleeping, difficulty with social interactions, and irritability. [R. 319–20]. In June and July 2013, Claimant continued to report to Dr. Wright and Dr. Uzogara her issues with depression, exhaustion, irritability, hostility, and "ongoing and pervasive social difficulties." [R. 322, 402–403]. In July 2013, Dr. Uzogara documented Claimant's symptoms of depression, anxiety, and mood swings, but also noted that she was coherent, logical, of average cognition and no perceptual impairment, with fair insight and mild judgement impairment. [R. 402–03]. In November 2013, Claimant reported these ongoing issues to Emily Hames, LICSW, and stated that she felt bullied at her part-time seasonal job. [R. 644–45].

In January of 2014, psychiatrist Dr. Richard C. Pillard, M.D. noted that Claimant had been laid off from her job and was "not doing well at all." [R. 672.] Claimant continued to experience issues with anxiety, severe depression, social isolation and chronic irritability. Id. Claimant visited Dr. Pillard again in February of 2014, where they discussed her plans to apply for SSDI and her feelings of resentment toward her family and sensitivity to criticism of any kind. [R. 654]. Later in February, Dr. Pillard noted that while Claimant was alert, cooperative, intelligent, and that she was not a high-risk patient, she was also "clearly unable to work from a psychiatric perspective because of PTSD, Major Depression, and Borderline Personality [Disorder]." [R. 649–50]. Claimant also visited primary care physician Dr. Nicolette Oleng, M.D., in January of 2014, and during the appointment acted "very hostile," and was "actively splitting" her personality. [R. 715, 717].

In March, April, and May of 2014, Claimant continued to complain to Dr. Pillard, Dr. Oleng, and Emily Hames on several occasions of social isolation, anxiety, difficulty sleeping, fears about bullying, hopelessness about getting along with others, difficulty finding and retaining employment, and a withdrawal from her family. [R. 374, 419–21, 461–62, 466–67, 472, 516–17]. In March of 2014, Claimant visited endocrinologist Dr. Dong Wook Kim, M.D. seeking weight management treatment. [R. 476]. Dr. Kim's notes characterized Claimant as a "46 years old female with depression, PTSD, borderline personality disorder, and normal [body mass index]," but later stated that Claimant denied depression and anxiety, and that she is obese. [R. 476, 478]. Gynecologist Raja A. Sayegh, M.D. noted during an annual exam in April of 2014 that Claimant was well developed, well nourished, in no acute distress, and alert. [R. 353, 357]. During a May 2014 appointment, Dr. Pillard wrote that Claimant was "disabled, no doubt and has done better from a mental status point of view since she quit the exploitative job she had

6

struggled with." [R. 481]. Dr. Pillard noted that Claimant's prescribed dose of Seroquel had been reduced from 800 mg. to 500 mg., as an effort to reduce the overeating Claimant had complained of as a side effect of the Seroquel. [R. 481, 649]. Dr. Pillard also stated that, while Claimant was "a thoughtful and intelligent person who [wa]s gradually improving in her ability to deal with people," he had agreed with Claimant on a plan to apply for SSDI because "[s]he is disabled." [R. 481].

Claimant also visited Dr. Roger Komer, M.D.,[4] who completed a consultative examination report for Disability Determination Services in June of 2014. [R. 457]. Claimant reported her history of mental illness, joint pain in her knees, and weight gain, and stated that she could walk three to five blocks. [R. 457–58]. She also reported her difficulty sleeping and stated that medication improved her ability to sleep. [R. 458]. Dr. Komer documented Claimant's history of mental illness, including PTSD, anxiety, depression, insomnia and nightmares, and wrote that she appeared "depressed and apathetic," but seemed physically normal with the exception of mild bony crepitus and possible mild degenerative joint disease in her knee joints. [R. 458–59].

Between September and December of 2014, Claimant complained of sleep problems to psychiatrist Dr. Oluranti Adepoju, M.D. During their September meeting, Claimant denied experiencing depression or anxiety symptoms, and Dr. Adepoju noted that her mental status examination was normal. [R. 583, 590, 606, 608–609]. Claimant complained of an increased appetite in October, and while Dr. Adepoju characterized her mood as "anxious," he noted no depressed mood or sleep difficulties. [R. 590, 592]. Claimant complained of severe sleep

---

[4] Dr. Komer's specialty is not apparent from the record; however, it is clear that he was working in a consultative capacity for Disability Determination Services.

problems in December, with Dr. Adepoju noting "she has not had a good night sleep in weeks, it is getting very frustrating" but did not mention any other health concerns. [R. 583].

In January of 2015, Claimant again stated to Dr. Adepoju that she was experiencing severe sleep problems which had lasted for seven weeks, but she did not complain of any depressive symptoms. [R. 576]. Later that month, Dr. Adepoju noted: "She continues those night and daytime awakening [sic]. Says she dozes and does not sleep . . . . Complains of exhaustion and mental confusion." [R. 569]. In February of 2015, Claimant reported an improvement in her sleep, and that she was sleeping four to five hours most nights. [R. 562]. Dr. Adepoju wrote that Claimant had a stable mood and no psychosis. Id. In March 2015, Claimant again stated that she was sleeping four to five hours per night and Dr. Adepoju noted no other issues. [R. 555].

In April of 2015, Claimant reported difficulty sleeping to psychotherapist Shayna Smallwood, but noted a slight improvement, and also claimed feelings of dysphoria and issues with her familial relationships. [R. 723–25]. Smallwood found that Claimant had no issues with mood, memory, insight, cooperation, engagement, judgement, or coherence. [R. 724]. On June 5, 2015, Smallwood recorded that Claimant had fair insight and judgment, normal cognition and attention, and a concrete thought process, but that Claimant also "continued to discuss disruption in relationships with family members," and that her mood and affect were "angry." [R. 733–34]. On June 4, 2015, when Claimant again visited Dr. Kim for weight management, Dr. Kim wrote that Claimant's weight and mood were stable. [R. 729]. Dr. Kim's narrative description of Claimant indicated that she suffers from depression, PTSD and borderline personality disorder, but that she denied depression and anxiety. Id. On June 23, 2015, Dr. Adepoju noted that Clamant was "doing well," with no sadness, helplessness, or hopelessness, enjoying normal sleep and appetite, and gave Claimant a generally good mental status evaluation. [R. 736–37]. On June

8

24, Dr. Oleng wrote, "Patient with irritable mood, but not different from her usual. Actually today the patient laughed for the first time since I have met her in over 1 year." [R. 740]. From Claimant's alleged onset date forward, Claimant was consistently scored by various doctors as having a GAF rating of 55.[5]

### 2. Medical Opinions

On May 1, 2014, Dr. Pillard completed a Mental Residual Functional Capacity ("RFC") Questionnaire to assess Claimant's impairments. [R. 688–91]. On March 13, 2015, Dr. Adepoju also completed a Mental RFC Questionnaire for Claimant. [R. 550–54]. The questionnaires reflect very similar evaluations of Claimant's mental RFC. Each doctor recorded an almost identical list of symptoms, including, among others, anxiety, mood disturbances, aggression, PTSD, sleep disturbances, and instability of interpersonal relationships. [R. 550, 688]. In all but two categories of "Mental Abilities and Aptitudes Needed to do Unskilled Work," the doctors scored Claimant as either "Seriously limited, but not precluded," or "Unable to meet competitive standards." [R. 552, 690]. In every category of "Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work," the doctors scored Claimant as either "Seriously limited, but not precluded," or "Unable to meet competitive standards." [R. 552, 690]. Each doctor assessed Claimant as having a GAF score of 55. [R. 550, 688]. Dr. Adepoju noted that Claimant's impairments would cause her to be absent from work for more than four days per month, which is the most severe selection available on the questionnaire. [R. 551]. Dr. Pillard's questionnaire did not include this question.

---

[5] The record contains over thirty references to Claimant's GAF rating of 55. See, e.g., [R. 326, 331, 445, 581, 656].

### 3. Hearing Testimony

On September 8, 2015, Claimant testified at a hearing before ALJ Paul Carter. [R. 21, 30]. She stated that she was being treated for depression, anxiety, and delayed sleep phase syndrome. [R. 47]. Claimant testified that she performs her own shopping for groceries and is sometimes able to do housework and cook for herself. [R. 49]. She asserted that her mental health symptoms interfere with her work, causing frequent conflicts with customers and co-workers, difficulty concentrating, and a lack of energy. [R. 53–54]. Claimant had no friends and was isolated from family members. [R. 55]. She stated that she would be unable to be at work on time, concentrate and follow directions at work, and get along with co-workers due to lack of sleep and exhaustion. [R. 56].

Vocational expert ("VE") Robert Lasky also testified at the hearing. [R. 57]. The VE testified that Claimant's impairments would preclude her from returning to her previous work, but that jobs that Claimant would be able to perform exist in significant numbers in Massachusetts. [R. 60–61].

## II. THE ALJ'S DECISION

On October 19, 2015, the ALJ issued a decision finding that Claimant was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act. [R. 30]. At step one of the five-step analysis, the ALJ determined that Claimant did not engage in substantial gainful activity during the time from her alleged onset date, December 1, 2013, through her date last insured, December 31, 2015. [R. 24, 39–40].

At step two, the ALJ found that Claimant had three impairments: depressive disorder, generalized anxiety disorder/PTSD, and borderline personality disorder, which, individually or in combination, caused severe impairments as defined by the Social Security Act's regulations. Id.

The ALJ noted that the record showed a number of other health conditions, including oral aphthous ulcers (mouth sores), insomnia, and arthralgia of the knee. Id. The ALJ determined that these limitations were not severe because the record showed that they were either controlled with medication, minimally treated, lacked specific complaints, or failed to limit claimant's ability to work. Id.

At step three, the ALJ found that Claimant's mental impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Id. Specifically, the ALJ found that Claimant's impairments did not meet the criteria listed under 12.04 (affective disorders), 12.06 (anxiety-related disorders), or 12.08 (personality disorders). Id. The ALJ determined that Claimant had a mild limitation in activities of daily living; moderate difficulties in social functioning; moderate limitations in concentration, persistence, or pace; and that the record showed no evidence regarding episodes of decompensation. [R. 24–25].

At step four, the ALJ found that Claimant did not have the RFC to perform her relevant past work. [R. 28]. At step five, the ALJ determined that she did have the RFC required to perform some jobs which exist in significant numbers in the national economy. [R. 29]. The ALJ determined, pursuant to the VE's testimony, that Claimant could perform work as a store laborer/general helper, photocopy machine operator, or ticket taker. [R. 29–30].

## III.  STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the

11

Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (citing 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may . . . at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or

12

judging matters entrusted to experts."). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, (1938)). The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## IV. DISCUSSION

Claimant advances three reasons why the ALJ's determination should be reversed. As explained below, the Court finds that Claimant's second argument has merit, and therefore remands the ALJ's decision for further proceedings.

### 1. Whether the ALJ Gave Proper Weight to Treating Physicians' Opinions

Claimant argues that substantial weight should have been given to treating physicians Dr. Pillard's and Dr. Adepoju's opinions as expressed in their Mental RFC Questionnaires. [ECF No. 17 at 9–12]. A treating source's opinion should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record." Taylor v. Astrue, 899 F. Supp. 2d 83, 87 (D. Mass. 2012); 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."); Policy Interpretation Ruling Titles II & XVI: Giving Controlling Weight to Treating Source Med.

Opinions, SSR 96-2P at *1 (S.S.A. July 2, 1996) (same). "[A]ny conflict between a treating physician's opinion and other evidence in the record is to be resolved by the Commissioner." Rodriguez v. Astrue, 694 F. Supp. 2d 36, 46 (D. Mass 2010). While an ALJ is entitled to resolve conflicts in the evidentiary record, she "cannot pick and choose evidence that supports a particular conclusion." Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing Fiorello v. Heckler, 725 F.2d 174, 175–76 (2d Cir. 1983). "Regardless of whether or not the administrative law judge decides to discount the treating physician's opinion, the decision 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record.'" Rodriguez, 694 F. Supp. 2d at 42 (quoting SSR 96–2p, 1996 WL 374188, at *5).

The ALJ afforded "little weight" to Dr. Adepoju's and Dr. Pollard's opinions as expressed in their Mental RFC Questionnaire because their opinions were "inconsistent with the medical record as well as their own treatment notes." [R. 28]. The ALJ's opinion cites extensively to the medical record, including the treating psychiatrists' notes, other health care providers' treatment notes, and the state agency psychological consultants' assessments. [R. 21–30]. Both Dr. Adepoju's and Dr. Pollard's Mental RFC Questionnaires characterized Claimant as moderately to severely impaired by her major depressive disorder, borderline personality disorder, and PTSD. [R. 550–54, 688–91]. Dr. Adepoju's notes rarely discuss such severe mental health impairments, however, and consist mainly of discussion of Claimant's pervasive sleep issues. [R. 555, 562, 576, 583]; see discussion infra Section IV.2. The ALJ is correct that Dr. Adepoju's opinions are not supported by her own treatment notes. Dr. Adepoju's treatment notes are also inconsistent with Dr. Pollard's RFC assessment and treatment notes, which extensively discuss Claimant's mental health limitations. In addition, the ALJ cited to multiple treatment

14

notes in which Claimant denied depression, and had a "euthymic" (normal) mood [R. 27–28]. The ALJ's decision to afford little weight to Dr. Adepoju's and Dr. Pillard's opinions does not warrant reversal or remand, since the ALJ reviewed the record as a whole and provided specific reasons for his conclusion that their opinions were not "well-supported" by their treatment notes and other evidence within the medical record.

### 2. Whether the ALJ Erred in Failing to Consider Claimant's Delayed Sleep Phase Syndrome in Determination of her RFC

Next, Claimant argues that the ALJ erred in failing to consider her diagnosis of delayed sleep phase syndrome in his determination of her RFC. Dr. Bhopal diagnosed Claimant with delayed sleep phase syndrome in July of 2012. [R. 317–18]. "[D]elayed sleep phase type is based primarily on a history of a delay in the timing of the major sleep period (usually more than 2 hours) in relation to the desired sleep and wake-up time, resulting in symptoms of insomnia and excessive sleepiness." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 391 (5th ed. 2013). Extreme difficulty awakening and morning confusion are also symptoms of delayed sleep phase syndrome, which is strongly associated with depression and personality disorder. Id. at 392. The notes accompanying Dr. Bhophal's diagnosis reflect that Claimant has been suffering from sleep disturbances since age 13 or 14. [R. 315]. Claimant indicated that she sometimes cannot sleep all night, and is not able to fall asleep until the next morning; occasionally, she is unable to sleep for a period of several days. [R. 315]. Claimant also reported to Dr. Bhopal that when she is awake for more than 18 to 24 hours, she experiences hallucinations, anxiety, irritability, and paranoia. [R. 315–16]. Claimant stated that her inability to sleep caused her extreme distress, resulted in an inability to hold a job for more than four to five months at a time, led her to be fired from her last job due to irritability caused by lack of sleep, and that she had a nervous breakdown because of her exhaustion. [R. 316–17].

15

The medical record from 2011 to 2015 consistently reflects Claimant's ongoing sleep issues. Claimant complained of difficulty sleeping or feeling tired to Dr. Uzogara [R. 329], Dr. Berrouet [R. 341, 379, 435], Dr. Wright [R. 319–20], Dr. Pillard [R. 419–21, 672], Dr. Khan [R. 440, 443–44], Dr. Komer [R. 458–59], LICSW Hames [R. 461–62, 467, 517, 644], Dr. Adepoju [R. 555, 569, 576, 583, 598], and psychotherapist Smallwood [R. 723–24]. Claimant also testified about her delayed sleep phase syndrome during the hearing held before the ALJ. When asked why she would be unable to be punctual and maintain a regular work schedule, Claimant replied,

> I'd have difficulty showing up, because I'd be exhausted, unable to get to work on time. I'm not sleeping thoroughly through the night, and when I wake up, I'm not well-rested. Again, that contributes to difficulty concentrating, and following directions, remembering directions, and getting along, not having conflicts with customers or fellow employees.

[R. 56]. Claimant also testified that she lies down during the day every day because she is not well-rested when she wakes up in the morning. [R. 48–49].

At step two, the ALJ did not consider several of Claimant's impairments, including her sleep disorder, to be severe because the conditions were either "controlled with medication, minimally treated, or . . . lack[ed] specific complaints and functional limitations preventing work." [R. 24]. These justifications with regard to her sleep disorder are unsupported by substantial evidence in the record. The ALJ cites exhibits 5A at 6, 3F at 3, 4F at 67–68, and 10F at 3 to support his finding; however, these treatment notes only discuss Claimant's other impairments, and none discuss her delayed sleep phase syndrome or suggest that this impairment is controlled with medication or minimally treated. Id. The ALJ mentioned in his RFC determination that some doctors noted relative improvement when Claimant was taking certain sleep medications. [R. 26–27]. While Dr. Khan [R. 440], Dr. Adepoju [R. 555], and Dr. Komer

16

[R. 457–58], did each note single instances of relative improvement in Claimant's sleep while on medication, the overall weight of the medical record shows that, over the course of years, Claimant continued to suffer from difficulty sleeping even with medication. In addition, the medical record and Claimant's testimony show specific complaints related to her delayed sleep phase syndrome's impact on her functional limitations and inability to work. Therefore, the ALJ's determination at step two that Claimant's delayed sleep phase syndrome was "controlled with medication, minimally treated, or . . . lack[ed] specific complaints and functional limitations preventing work" is unsupported by substantial evidence in the record.

The Commissioner points out that even if the ALJ erred in finding the delayed sleep phase syndrome non-severe at step two, this is not, on its own, reversible error. [ECF No. 23 at 16]. Claimant appears to concede this point, but argues instead that the ALJ's reversible error occurred at step four, in his failure to consider all of Claimant's impairments, including her delayed sleep phase syndrome, in his RFC determination. [ECF. No. 26 at 4–5]. "Any error at step two of the sequential analysis is harmless where the evaluation proceeds past step two *and* the administrative law judge considers all of the claimant's impairments at step four." Jones v. Colvin, No. 12-40061, 2014 WL 575457, at *12 (D. Mass. Feb. 10, 2014) (emphasis added). The ALJ must consider all "medically determinable impairments," including those which are not severe, when assessing a claimant's RFC. 20 C.F.R. § 416.945(a)(2). A determination of error thus depends upon whether the ALJ adequately considered Claimant's delayed sleep phase syndrome in his calculation of her RFC.

In his step four RFC determination, the ALJ mentioned Claimant's sleep issues only three times, and then only in brief references to notes in Claimant's medical record. The ALJ's decision never refers directly to her diagnosis of delayed sleep phase syndrome, and only

17

discusses Claimant's "insomnia," "difficulty falling asleep," or "trouble sleeping," all of which are symptoms of delayed sleep phase syndrome. [R. 26]. Nor did he address Dr. Bhopal's notes regarding the impact that her delayed sleep phase syndrome had on her daily life and ability to work. The ALJ did not include Claimant's sleep phase syndrome when posing a hypothetical to the VE. In addition, the ALJ did not discuss Claimant's hearing testimony, which linked her sleep issues to her inability to work. The ALJ's statement that "all impairments have been adequately addressed and all medically supported restrictions of record have been incorporated into the decision's [RFC] assessment," along with a few brief references to Claimant's complaints of difficulty sleeping, are insufficient to show that the ALJ adequately considered the evidence of Claimant's delayed sleep phase syndrome in his RFC analysis. [R. 24]; See Jones, 2014 WL 575457, at *12 (finding that ALJ had not properly considered Claimant's impairment despite some discussion and discounting of the impairment in RFC determination).

As discussed above, the ALJ's contention at step two that Claimant's delayed sleep phase syndrome was controlled by medication or lacked specific complaints and functional limitations preventing work is not supported by substantial evidence in the record, which includes regular documentation of her difficulty sleeping throughout the relevant time period, despite medication, and the effect of this impairment on her ability to work. Further, the ALJ did not consider Claimant's delayed sleep phase syndrome in his step four RFC determination. The ALJ's decision was thus was not supported by substantial evidence, and the case must be remanded for additional consideration of the severity of Claimant's delayed sleep phase syndrome at step two and its impact on her RFC at step four.

      **3.      Whether the ALJ Made a Judgment on a Matter Reserved for Experts**

Claimant finally argues that the ALJ made a judgement on a matter reserved for experts by posing a hypothetical question to the VE which included facts or findings not fairly reflected by the record, and that the ALJ was thus not entitled to rely on the VE's testimony. [ECF No. 17 at 15–16]. In particular, Claimant contends that the ALJ's hypothetical described an individual who would be allowed to shift her body position every thirty minutes without losing her focus, and that the record does not show that Claimant was capable of shifting her body position without losing focus. Id.

In order for an ALJ to rely upon a VE's answer to a hypothetical question, "the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). "[T]he hypothetical posed to a medical expert must include all of the claimant's relevant impairments." Aho v. Comm'r of SSA, No. 10-40052, 2011 WL 3511518 at *7 (D. Mass. Aug. 10, 2011). Functional limitations included in the ALJ's hypothetical must "accurately reflect[] the objective medical findings in the record." Lema v. Astrue, No. 09-11858, 2011 WL 1155195, at *6 (D. Mass. Mar. 21, 2011) (quoting Haidas v. Astrue, No. 08-11274, 2010 WL 1408618, at *5 (D. Mass. Mar. 31, 2010)). "An ALJ cannot interpret raw medical evidence to discern functional limitations." Aho, 2011 WL 3511518, at *7. The ALJ is nonetheless not "precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment." Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) (holding that the Secretary was justified in making common-sense determination that Claimant was capable of sedentary work when doctor had made no "express functional conclusions" about Claimant's capabilities).

Here, the ALJ considered Claimant's moderate difficulties in concentrating, acknowledging in his RFC that her limitations "at different times . . . will affect her concentration [and] attention to task." [R. 25]. These concentration difficulties are evidenced at multiple points in the medical record. [R. 78–79, 90, 101, 552, 690]. The record also shows that Claimant was capable of maintaining attention for two-hour spans, and of sustaining persistence and pace for the duration of a workday on a 40 hour per week schedule. [R. 78, 91, 102]. While the record contains no specific discussion of Claimant's ability to shift position without losing focus, the ALJ was entitled to make a common-sense judgement that the Claimant, who did not have severe physical limitations and could maintain attention, persistence and pace, would be capable of shifting her physical position without going "off task." The Court agrees with the Commissioner that the ALJ's hypothetical was supported by the medical evidence in the record, and there was no error in assessing Claimant's ability to shift her body position without losing focus or in posing such a hypothetical to the VE.

## V. CONCLUSION

For the reasons stated herein, the Court finds that the ALJ's decision was not supported by substantial evidence and therefore <u>DENIES</u> the Commissioner's motion to affirm [ECF No. 22] and <u>GRANTS</u> the Claimant's motion to reverse or remand [ECF No. 16]. The decision of the ALJ is <u>VACATED</u>, and the case is <u>REMANDED</u> for further administrative proceedings consistent with this opinion.

    **SO ORDERED.**

November 30, 2017                <u>/s/ Allison D. Burroughs</u>
                          ALLISON D. BURROUGHS
                          U.S. DISTRICT JUDGE